**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

---------------------------------------------------------------------

**MICHELLE DOWNS**
3212 Bon Air Avenue
Louisville, KY 40220

and

**LAURIE JARRETT**
3505 Allison Way
Louisville, KY 40220

         **Plaintiffs,**

         **v.**

**INSIGHT COMMUNICATIONS**
**COMPANY, L.P. d/b/a INSIGHT**
810 7th Avenue, 41st Floor
New York, NY 10019

         **Defendant.**

:
:
:
:
:
:    **Class Action**
:
:
:
:
:
:
:
:
:
:
:
:    **No. 3:09-CV-93-S**
:    *Electronically Submitted*
:
:
:

---------------------------------------------------------------------

## FIRST AMENDED COMPLAINT

Plaintiffs, Michelle Downs and Laurie Jarrett (hereinafter "Plaintiffs"), individually and as representatives of a Class of similarly situated individuals, bring this Complaint against Insight Communications Company, L.P. (hereinafter "Defendant" or "Insight") and allege the following:

## INTRODUCTION

1.  This is a class action brought on behalf of all persons who purchase Premium Cable Services[1] from Defendant Insight Communications Company, L.P. d/b/a Insight ("Insight") and have been compelled to pay cable box rental fees to Insight. Insight sells tiers of cable television services. At the most basic level of service, the cable may be connected directly

---

[1] The term "Premium Cable Services" is defined in ¶ 18 herein.

to modern television sets without the need of additional equipment ("Basic Service").  However, for Premium Cable Services, Defendant's premium cable customers have no choice but to pay a rental fee for a "cable box" in order to view the cable television for which they pay a separate fee.  Defendant's actions constitute an unlawful tying arrangement resulting in an impermissible restraint of trade in violation of both state and federal law.

2.      Insight does not manufacture cable boxes; it purchases them, upon information and belief, almost exclusively from Motorola.  Insight will not permit a customer to acquire ownership of a cable box from either Insight or another manufacturer.  As alleged in further detail herein, Insight has restrained trade in cable boxes so that Insight is the exclusive source of cable boxes for its customers.  Insight has used this restraint of trade to extract additional revenues from premium cable customers by charging monthly rental fees in addition to the fees it charges for the Premium Cable Services.

3.      Plaintiffs bring this case as representatives of a class of Insight Premium cable customers described herein, alleging that Defendant's past and present activities constitute an impermissible restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act"), and these activities have and will continue to threaten to have adverse competitive effects on interstate commerce and on commerce within the Commonwealth of Kentucky and inflict direct economic injury upon the Plaintiffs.

**THE PARTIES**

4.      Plaintiffs are citizens of the Commonwealth of Kentucky who reside respectively at 3212 Bon Air Avenue and 3505 Allison Way, Louisville, Jefferson County, Kentucky.

5.      At all times relevant hereto, Plaintiffs have been subscribers to premium cable services provided by Defendant.

2

6.      Plaintiffs bring this action on their own behalf and on behalf of the following class of persons:

> All persons in the Commonwealth of Kentucky who subscribed to Insight Communications Company, L.P., for premium cable television services and paid a monthly rental fee for an accompanying cable box ("the Class").

Excluded from the Class are the Defendant; officers, directors or employees of Defendant; any entity in which Defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of Defendant; and any federal, state or local governmental entity, and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staffs. Plaintiffs reserve the right to modify or amend this Class definition if discovery and/or further investigation so necessitate.

7.      Defendant Insight is a publicly held New York corporation with its principle place of business located at 810 7th Avenue, 41st Floor, New York, NY 10019.  Insight regularly transacts business in the Commonwealth of Kentucky and may receive service of process through its registered agent, CT Corporation System, 4169 Westport Rd., Louisville, KY 40207.

8.      Upon information and belief, and for purposes of this complaint, Insight provides cable video programming services and leases cable boxes in numerous communities and/or clusters of communities throughout the Commonwealth of Kentucky.  For ease of reference, the geographical locations where Insight does business are articulated herein in terms of the community or communities they serve.  In reality, the actual geographic boundaries of the markets that Insight operates in, and controls are bounded by exclusive local franchises granted by local governing authorities (municipalities, counties, or other local governmental subdivisions) to offer cable television services Insight receives easements in which to operate its infrastructure.  In turn, Insight pays the franchise granting political subdivision a franchise fee

collected from subscribers within the franchise area based upon revenues received from cable subscription fees.

9.      Insight's unlawful business practices, as detailed herein, are uniform within the markets in which Insight sells its services.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 in that Plaintiffs, on their own behalf and on behalf of the Class, assert claims under the Sherman Anti-Trust Act, 15 U.S.C. §§ 1.

11.     This Court has supplemental jurisdiction over the state law claims raised herein pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in the Western District of Kentucky pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.

**FACTUAL BACKGROUND COMMON TO ALL CLASS MEMBERS**

13.     Upon information and belief, Insight is one of the ten largest providers of cable services in the United States, providing telecommunication services to over 700,000 customers in the Midwest.  Insight provides cable services to customers in numerous communities and/or clusters of communities in the Commonwealth of Kentucky.  Upon information and belief, Insight is the sole provider of Premium Cable Services in a majority of the communities and/or clusters of communities it serves, to include Jefferson and Oldham Counties, Kentucky.  Cable service providers are sometimes referred as cable multichannel video programming distributors ("MVPDs").

14.    A majority of Insight's customers are located within the Commonwealth of Kentucky, although they provide services to customers in the states of Indiana and Ohio, as well.

15.    Insight's past and present conduct described herein allows it to unfairly utilize its market power and/or economic power in the cable television markets controlled by Insight to compel the Class to acquire necessary cable boxes solely through rental from Insight, thereby harming members of the Class by removing competition for the retail sale of cable boxes.

**Tying and Tied Products**

16.    Insight's cable programming is offered to customers based upon tiers of service. At the least expensive level of service, customers receive a limited number of local and national channels for a monthly fee.  This is known as "basic cable".  Modern television sets are sold as "cable ready" – i.e., the television can receive basic cable by simply attaching the television to a cable connected to the cable MVPD.  Television sets which are not manufactured as "cable ready" units also require the use of a cable box.  However, due to the availability of "cable ready" televisions in the market, customers who rent a cable box but only receive basic level service are not included in the Class.

17.    Customers desiring more choice in video programming can, for an additional monthly fee, subscribe to Insight's premium services and pay an increased monthly fee to Insight.  Members of the Class are Insight customers who elect to service premium channels such as HBO, Showtime, and other specialty channels and video programming services not included in the basic cable services.

18.    For purposes of this Complaint, "Premium Cable Services" is defined as those cable services, which are not available to customers by simply plugging a cable into a cable-ready television.  This definition includes all scrambled or otherwise secured video channels, as

well as "pay per view" or "on demand" cable video programming, for which Insight charges fees other than the fee for basic cable, but may only be viewed through the use of a cable box.

19.     According to the most recent Federal Communications Commission ("FCC") report on competition in the industry, as of 2005, there were approximately 96.9 million subscriptions for Premium Cable Services sold by cable MVPDs (including, but not limited to, Insight) in the United States. Insight is one of the ten largest MVPDs in the country.

20.     The Premium Cable Services offered by Insight are the "tying product."

21.     In addition to paying a fee for cable television, customers must also pay a rental fee to Insight for a cable box, sometimes referred to as a "set-top box." The cable box in its simple form serves two functions. First the cable box allows the customer to receive video signals and to navigate among the channels carried on a particular cable system. The second function is a cable descrambler or "conditional access device" which controls the security features for premium channels to ensure that customers do not receive Premium Cable Services for which they have not paid.

22.     The "tied product" is the cable box Insight rents to customers, for an additional monthly fee, to enable them to access Insight's Premium Cable Services. For purposes of this pleading, the term "cable box" also includes the dedicated remote-control for said cable box, whether or not Insight charges for rental of the remote control. For purposes of this complaint, the term "cable box" also includes cable boxes which include features in addition to those required to perform the basic navigation and security functions, including, but not limited to cable boxes which have additional functionality as a Direct Video Recorder ("DVR").

23.     The tying product and the tied product are separate and distinct products. Insight does not design or manufacture the cable box. Insight purchases the mass produced cable boxes

from the manufacturer and compels its Premium Cable Services customers to rent the cable boxes from Insight.

24.     Although cable boxes are manufactured, or would be capable of manufacture, by numerous entities, upon information and belief, the market has been historically dominated by just two suppliers, Scientific Atlanta (a subsidiary of Cisco Systems, Inc.) and Motorola, Inc., of which Motorola works under contract with Insight and supplies cable boxes to Insight.  Upon information and belief, neither Motorola nor Scientific Atlanta will sell these cable boxes to the general public.

**Coercion to Purchase the Tied Product**

25.     Insight requires class members to rent a cable box directly from Insight and from no other source besides Insight.  Thus, Insight ties its Premium Cable Services to the cable box that it requires class members to rent.

26.     Prior to July 1, 2007, the only cable boxes recognized as permissible by Insight were those rented to consumers by Insight.  Insight would not provide the Premium Cable Services unless the customer also rented a cable box from Insight.  However, as detailed herein, even after July 1, 2007, Insight as a practical matter, continues to require consumers to acquire cable boxes only through Insight and denies consumers the benefits of a competitive market in these devices.

27.     Insight's practice of requiring consumers to rent a cable box from Insight to the exclusion of any other source was recognized as an anti-competitive practice.  Congress enacted 47 U.S.C. § 549, Section 629 of the Communications Act of 1954, directing the FCC to adopt regulations:

to assure the commercial availability, to consumers of multichannel video programming and other services offered over multichannel video programming services [i.e. cable companies] of converter boxes, interactive communications equipment and other equipment used by consumers to access multichannel video programming and other services offered over multichannel video programming systems, from manufacturers, retailed and other vendors not affiliated with any multichannel video programming distributor.

28.    Pursuant to 47 U.S.C. § 549, in 1998, the FCC, in an effort to stop the anticompetitive practices described herein, directed the cable industry to make the security elements of a cable box available separately from the channel navigation aspects of a cable box (sometimes also called "host devices"), so that a free and open market for such cable boxes could be developed by consumer electronic retailers. The cable industry was given until January 1, 2005 to make available a separate security element (referred to as a "point of deployment module" or "POD") which would provide the security element of the cable box separately from the navigation device.

29.    The cable and consumer electronics industries use the common name "CableCARD" to refer to the POD security devices compelled by the FCC.

30.    Insight and other MVPDs were successful in delaying the effective date of the regulation from January 1, 2005, until July 1, 2007.

31.    Insight's control of Premium Cable Services in the markets in which it does business enables Insight to control the security mechanisms and navigation technology used in its systems.

32.    Upon information and belief, Insight has used it control over the geographic markets in which it does business to inhibit and thwart the effectiveness of CableCARD technology and to preserve its ability to coerce its customers into acquiring cable boxes solely by rental from Insight in a non-competitive market.

33.    Manufacturers of consumer electronic products who desire to enter into the market for cable boxes, have repeatedly complained that Insight and other cable companies have engaged in practices to prevent the CableCARD from becoming an effective option for consumers who no longer wish to pay rental fees for cable boxes. For example, in December, 2006, the Consumer Electronics Association ("CEA") sent a lengthy objection to the FCC concerning the practices of cable MVPDs which were thwarting the implementation of CableCARD and preventing consumer electronics manufactures from competing in the cable box market. The existence of the CableCARD has not produced the intended result of introducing competition into the market for cable boxes.

CableCARDs

34.    Upon information and belief, CableCARDs are not readily available and/or promoted to Insight customers.  To wit, Insight's website specifically states, "Insight Digital Cable requires a digital set-top box."[2]

35.    Upon information and belief, even though the technology exists such that CableCARDs perform the same function as a cable box, Insight and other MVPDs have limited the effectiveness of CableCARDs, making it highly unlikely that even the relatively few customers owning new televisions with CableCARD capabilities would choose to rent the CableCARDs from Insight.

36.    These limitations severely limit the desirability of CableCARDs, so that consumers will have no real choice but to rent a cable box from Insight.

37.    Despite the FCC mandated creation of CableCARD technology, Insight continues to limit the employment of that technology and continues to require consumers of its Premium

---

[2] "Digital Cable: FAQ" available at http://www.insight-com.com/help-cable-6067.htm (last viewed Sept. 4, 2009).

Cable Services to continue to rent their cable boxes from Insight as a requirement of receiving the Premium Cable Services for which they pay. As a result of Insight and other MVPD's actions, CableCARD technology has not been widely adopted or marketed by consumer electronic manufacturers.

38.    As further evidence of Insight's intent and ability to prevent the CableCARD technology from diminishing its control over the cable box market, Insight has preserved its position as the sole supplier of cable boxes to its customers by implementing technology which renders the CableCARD technology useless, or impairs its utility, unless the customer is also renting a cable box from Insight.

**Economic Power in the Tying Product Market**

39.    Insight is one of the ten largest cable MVPDs in the United States.

40.    Cable MVPDs, including Insight, do not normally compete against each other, but operate in geographically divided local markets. Generally, Plaintiff and all other current and potential cable television subscribers in a Insight market have no choice but to contract with Insight for cable service. Accordingly Insight has *de facto* monopoly power in many areas in which it provides cable television services or otherwise has sufficient market power to appreciably restrain free competition as alleged herein. Indicative of such monopoly power, over the last decade, average cable prices paid by consumers have risen by 93%, or three times the inflation rate over the same period.

41.    In those markets controlled by Insight, Insight's control over all cable television services naturally gives Insight control over Premium Cable Services.  Although the tiers of service are vertically differentiated, Premium Cable Services rely upon the same basic infrastructure, with the addition of the cable box in the customer's home.

42.    According to the Thirteenth Annual Assessment of the Status of Competition in

the Market for the Delivery of Video Programming, issued by the FCC on January 19, 2009 (the

"FCC Assessment"), although video programming is distributed by means other than cable, most

notably broadcast and satellite services, cable MVPD is the dominant force in the market, and

enjoys a nationwide market share of almost 70%. A Congressional research report in 2007

found that cable controlled 69% of the nationwide MVPD market, compared to 27.7% for direct

satellite transmission. Moreover, any nationwide statistic on cable vs. Satellite MVPD

competition under-represents Insight's competitive position in the markets in which it chooses to

do business, in that satellite MVPD services are available in areas in which no cable television

service is available. Conversely, in urban areas, the physical requirements required to receive

satellite MVPD services (an external surface with a clear sight line to the sky on which to

attach a satellite dish) are harder to find, and often specifically foreclosed to tenants and

apartment owners by landlords and/or condominium or cooperative rules. The difficulty in

meeting the physical requirements for receiving satellite MVPD services further limits the

competitive pressure of satellite services upon cable services. Thus, a 2005 general accounting

office ("GA") study found that satellite MVPD market penetration was only 13% in urban areas,

compared to 29% in rural areas.

43.    In addition to Insight's claimed superiority in service and reliability over satellite

MVPD services, Insight enjoys a competitive advantage over such services by its ability to

"bundle" its MVPD services with broadband internet access and phone service, provided over

the same cable facilities. Because broadband internet access and phone service are not available

through satellite MVPD technology, Insight enjoys a competitive advantage over satellite

MVPDs in those areas in which Insight does business.

44.    Moreover, in those markets in which Insight does business, it has a further

advantage as the incumbent service provider in that switching from Insight cable to another

MVPD provider, whether an overbuilder, an incumbent phone company or a satellite MVPD, carries inherent costs to the consumer, including equipment acquisition and time, which must be weighed against whatever benefit the consumer perceives will be attained as a result of the change. Thus, studies have found that even though satellite MVPD customers indicate a high degree of satisfaction with their service, and cable MVPD customers indicate a low degree (less than 50%) of satisfaction with their service, there remains little movement between the two.

45.     As a result, satellite MVPD service is not a suitable direct substitute for cable MVPD services. It has not been demonstrated that customers are willing to transfer service from a cable MVPD to a satellite, despite monopoly pricing for existing customers of the cable MVPD. The FCC Assessment cites evidence that competition from non-cable video programming does not have an effect of restraining prices charged by cable MVPDs. However, in the few locations where consumers have a choice between two cable services, the FCC reports that prices for cable service are 20% lower than in locations with only one cable MVPD.

46.     There are also very high barriers to entrance for any potential cable competitor in an established cable MVPD market. The FCC Assessment notes that, along with the high capital cost of constructing a parallel cable system, there are obstacles to competition created by local franchising authorities, obtaining access to multiple dwelling unit customers (for example - tenants in apartment buildings) and obstacles created by exclusive programming rights to popular channels.  As a result of these obstacles, there has been very little effort to construct cable systems to compete with existing cable systems and such systems are believed to serve less than 2% of the MVPD market.

47.     Where a competing cable system - referred to in the industry as an overbuild - has been created, the overbuild systems are not geographically coextensive with incumbent cable system.  Such overbuilt systems are usually created by relatively small companies.  Insight can

respond to such overbuilt systems by lowering prices, not in the entire market, but only in those areas in which the overbuild system actually competes.  More detailed information concerning the geographic scope of such overbuild cable systems is in the possession of Insight and available in the course of discovery.

48.     The only apparently viable threat to Insight's market power has been the very recent arrival of competing MVPD services through fiber optic phone facilities offered chiefly through AT&T.  These services have not previously been commercially available to consumers on a widespread basis and are viewed as an arising threat, rather than a current competitive influence upon cable MVPDs.  Again, as with satellite MVPDs, customers incur substantial switching costs in changing service.

49.     According to the FCC Assessment, the demand for, and price of, Premium Cable Services has consistently risen, resulting in higher revenues for Insight and other cable MVPDs offering premium services.

**Anticompetitive Effects in the Tied Market**

50.     As noted above, for most of the relevant time period, the United States market for cable boxes has been dominated by just two companies for years, Scientific Atlanta and Motorola.

51.     Insight is simply purchasing cable boxes at a fixed cost from the manufacturers only to turn around and rent the very same boxes to the Class, with full knowledge that the Class, as a result of Insight's improper conduct, has no choice but to pay the rental fees changed.

52.     Insight not only refuses to permit customers to use other brands of cable boxes, Insight refused to sell its customers the cable boxes it rents to them and does not permit such products to be purchased directly from the manufacturer for use with a Insight system.

53.     Upon information and belief, Insight's suppliers of cable boxes are able to

dominate the market as a result of the anticompetitive conduct of Insight and other cable MVPDs. Because Insight and other cable MVPDs refuse to permit customers to acquire cable boxes other than by rental through the cable company, consumers suffer, and the suppliers to Insight and other cable MVPDs benefit from the removal of competitors and competition in the market for cable boxes. At the same time, Insight benefits from the absence of a competitive consumer market for cable boxes because the absence of competition allows Insight to compel consumers to rent the cable box from Insight, thereby producing a monthly revenue stream from the Class to Insight arising directly from its anticompetitive conduct.

54.     Upon information and belief, based upon allegations made in other litigation, Scientific Atlanta and Motorola have previously demonstrated very close relationships with cable MVPDs, including at least one documented case of a willingness to act in collusion with cable MVPDs to manipulate sales data and contracts relating to the sales of cable boxes.

55.     The contracts between Insight and the suppliers of cable boxes are not public information but are in the possession of Insight and may be obtained in discovery. It is not presently known whether such contracts contain an explicit agreement by the manufacturers to refuse to deal with the general public in selling cable boxes.

56.     If not for the tying of products, Plaintiffs and the Class could purchase a cable box from a manufacturer of their choice and use it to access the Premium Cable Services provided (for a cost) by Insight. As noted above, the CEA (previously defined) has expressed not only a willingness to enter into the cable box market, but has protested to the FCC that major cable MVPDs have engaged in apparently coordinated efforts to keep them out of that market.

57.     As pointed out by the CEA's December 2006, letter to the FCC, although cable MVPDs reported to the FCC that they were committed to the true2way technology, these same companies had previously represented that they were committed to CableCARD. Quite

14

obviously, consumer electronic manufacturers have not been willing to commit their resources to new product lines when the cable MVPDs have demonstrated a desire to preserve their market positions by changing the technological standard. The choice to use alternative technologies in lieu of an Insight cable box, has not been available, and is not currently available to the Class.

58.     The choice to use other cable boxes is not available to the Class as a result of Insight's practices. By compelling customers to rent cable boxes, and in restraining an open market for cable boxes, Insight coerces Plaintiffs and the Class to pay a significantly larger sum of money than would be required if the two distinct products (Premium Cable Services and cable box) were not tied by Insight.

59.     It is estimated that the useful like of a cable box is between 3 and 5 years. In many cases, the rental fees that the Class is forced to pay for the cable boxes supplied by Insight exceed the true cost of the cable box, even if the cost of the cable box were unadjusted for the effect of the anticompetitive practices on the price of cable boxes.

**The Effect On Interstate Commerce is Not Insubstantial**

60.     Insight provides cable services to more to than hundreds of thousands of customers.

61.     A substantial portion of Insight's subscribers have upgraded from basic cable to digital video services, referred to herein as the Premium Cable Services, and therefore rent cable boxes from Insight.

62.     The exact amount of revenue which Insight derives from the lease of cable boxes is not known, but should be readily discernable in discovery. It is clear, however, that the amount of money at issue is "not insubstantial."

**CLASS ACTION ALLEGATIONS**

63.   <u>Class Definition</u>:  Pursuant to Fed.R.Civ.P. 23(b)(1), (2) and (3), Plaintiffs bring this action on behalf of themselves and all others similarly situated, as members of the proposed Plaintiff Class.  The proposed Plaintiff Class is defined as follows:

> All persons in the Commonwealth of Kentucky who subscribed to Insight Communication Company, L.P., for premium cable television services and paid a monthly rental fee for an accompanying cable box.

64.   <u>Numerosity</u>:  The members of the Class are so numerous that their individual joinder would be impracticable in that: (a) the Class includes thousands of individual members; (b) the precise number of Class members and their identities are unknown to Plaintiffs but are well known to Insight and can easily be determined through discovery; (c) it would be impractical and a waste of judicial resources for each of the thousands of individual Class members to be individually represented in separate actions; and (d) the relatively small amount of damages suffered by some of the Class members do not make it economically feasible for those Class members to file an individual action to protect their rights.

65.   <u>Commonality/Predominance</u>:  Common questions of law and fact predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a.   Whether Insight is liable to Plaintiffs and the Class for violations of federal antitrust laws;

b.   Whether Insight has established an unlawful tying arrangement for the rental of cable boxes, in violation of state and federal laws;

c.   Whether Insight's actions have caused damages to Plaintiffs and the Class;

d.  Whether Insight should be enjoined from further violations of the state and federal laws;

e.  Whether Insight is liable to the Plaintiffs and the Class for treble damages as a result of its violation of federal antitrust laws;

66.  Typicality:  Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and all Class members have been injured by the same wrongful practices engaged in by Insight.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

67.  Adequacy:  Plaintiffs will fully and adequately assert and protect the interests of the Class.  Plaintiffs have retained counsel who is experienced in class actions and complex mass tort litigation.  Neither Plaintiffs nor their counsel have interests contrary to or conflicting with the interests of the Class.

68.  Superiority:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims by each of the Class members is economically unfeasible and impractical.  While the aggregate amount of the damages suffered by the class is in the millions of dollars, the individual damages suffered by each of the Class members as a result of the wrongful conduct by Insight are too small to warrant the expense of individual lawsuits.  Even if the individual damages were sufficient to warrant individual lawsuits, the court system would be unreasonably burdened by the number of cases that would be filed.

69.  Plaintiffs do not anticipate any difficulties in the management of this litigation.

## COUNT I

## <u>VIOLATION OF THE SHERMAN ANTITRUST ACT – UNLAWFUL TYING</u>

70.     Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein at length.

71.     The Sherman Antitrust Act makes it unlawful to enter into a contract in restraint of trade or commerce.  15 U.S.C. § 1.  Congress has granted a private right of action to individuals harmed by violations of this Act.  15 U.S.C. § 15.

72.     Plaintiffs, on their own behalf and on behalf of the Class, seek to recover damages they suffered as a result of Insight's violation of the Sherman Antitrust Act.

73.     Insight improperly ties and bundles its premium cable services with the required rental of a cable box.  Specifically, Insight contracted with Plaintiffs, and all Class members, to provide premium cable services but only on the condition that Plaintiffs, and all Class members, also pay a monthly rental fee to Insight for a cable box necessary to view and use the premium services.

74.     No member of the Class, including Plaintiffs, can unbundle or untie the two products, i.e., premium cable services and the cable box.

75.     As a result, Plaintiffs are forced to pay rental fees for the cable box in addition to the increased fees they pay for premium cable services.  Insight's conduct is even more egregious given that Insight is one of the largest providers of cable services in the Midwest, to include the Commonwealth of Kentucky.  In fact, in many areas of Kentucky, including Jefferson and Oldham Counties, it is believed that Insight is the sole provider of cable services.

76.     At all times relevant hereto, Insight has maintained, and exerted sufficient economic and market power to coerce Plaintiffs and the Class to pay rent for the cable box and accept the tied products.

77.     Insight's improper tying of the cable box to the premium cable service harms competition.   Upon information and belief, the cable box market is dominated by two manufacturers, one of which sells products to Insight.  Since Plaintiffs and the Class can only rent a cable box directly from Insight, there is little incentive for other manufacturers to enter the market, and those that do are precluded from renting or selling their products to Plaintiffs or the Class at lower, market-driven prices.

78.     There is a market for cable boxes separate and apart from the Insight premium cable services; the two products are separate and distinct products.  In fact, an individual can find cable boxes for sale on the open market today, but Insight refuses to permit a customer to use his own cable box when subscribing to Insight's premium services.

79.     At all times relevant hereto, Insight has maintained sufficient power in the cable market to force Plaintiffs and the Class to accept the rental arrangement which they otherwise would not accept absent Insight's extraordinary economic and market power.

80.     Insight's conduct has a substantial impact on interstate commerce in the market for cable boxes.

81.     Insight's bundling and tying of premium cable services and the cable box is an unreasonable restraint of trade in violation of the Sherman Antitrust Act.

82.     Insight's conduct has been, and continues to be, the direct cause of damage to the Plaintiffs and the Class.

83.    There is no lawful business justification for Insight's conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, demand judgment in their favor and against Defendants, as follows:

a.   For an Order certifying the Class pursuant to Fed.R.Civ.P. 23 appointing Plaintiffs as the representatives of the Class, and appointing counsel for Plaintiffs as counsel for the Class;

b.   For an Order that Insight violated the Sherman Antitrust Act, 15 U.S.C. § 1;

c.   For an Order enjoining Insight from continuing the practice of tying premium cable services to the rental of a cable box from Insight;

d.   For an award of all compensatory and other damages suffered by Plaintiffs and the Class;

e.   For an award of all statutory damages under the Sherman Antitrust Act;

f.   For an award of all costs incurred by Plaintiffs in pursuing this action;

g.   For an award of reasonable attorneys' fees;

h.   For any other relief the Court deems reasonable; and

i.   Plaintiffs demand a trial by jury of all factual issues.

Respectfully submitted,

/s/     Mark K. Gray
Mark K. Gray
Matthew L. White
Doris A. Kim
B. Travis Newman
FRANKLIN GRAY & WHITE
The Speed Mansion
505 West Ormsby Avenue
Louisville, Kentucky 40203
Tel.:  (502) 637-6000
Fax:  (502) 637-1413

**COUNSEL FOR PLAINTIFFS**