UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MICHELLE DOWNS and
LAURIE JARRETT, PLAINTIFFS

v. CIVIL ACTION NO. 3:09-CV-93-S

INSIGHT COMMUNICATIONS COMPANY, L.P.,
d/b/a INSIGHT, DEFENDANT

## **MEMORANDUM OPINION**

In this putative class action, two Louisville residents have sued Insight Communications Company (the dominant local cable television provider) for alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1. (We thus have jurisdiction pursuant to 28 U.S.C. § 1331.) Plaintiffs claim that Insight illegally requires its customers who desire to purchase certain of its cable services to rent from it a set-top cable box in order to receive the content. Insight has moved to dismiss the complaint for failure to state a cognizable Sherman Act claim. That motion will be granted and the complaint dismissed, but the court will grant the plaintiffs' request to file an amended complaint curing the flaws we locate herein.

**I**

The following facts are drawn from the face of the amended complaint. Insight sells its cable television services in a number of tiers. At the lowest ("basic cable") level, a subscriber can simply plug a cable into his modern "cable ready" television and begin receiving the content he has purchased. (A customer with an older television may have to acquire a cable box, but such users are not included in the plaintiffs' proposed class definition.) Higher levels of service—designated "Premium Cable Services"—require additional equipment even for owners of new TVs. These

premium services include specialty channels such as HBO and Showtime as well as "pay-per-view" and "on demand" programming.

Cable boxes serve two basic functions. First, they allow the customer to receive video signals and to navigate among the various channels provided by the cable company. Second, they provide security, allowing the customer access only to those channels for which he has paid. Two companies, Motorola and Scientific Atlanta, dominate the cable box manufacturing market, with Motorola working under contract with Insight. According to the complaint, neither manufacturer will sell its cable boxes to the general public. Instead, Motorola sells them to Insight, which then leases them to its subscribers. The problem arises, the plaintiffs allege, because Insight requires its customers to rent the cable boxes it provides in order to receive Premium Cable Services. Cable customers cannot buy the boxes on the open market, or acquire them from some other source. The plaintiffs admit that, pursuant to a regulation that went into effect on July 1, 2007, an alternative technology ("CableCARD") has been available to fulfill the security function of the cable box, but argue that Insight has inhibited the practical availability and effectiveness of this option in order to coerce its customers into renting Insight cable boxes. Plaintiffs also allege that Insight has "limited the effectiveness of CableCARDs," such that the alternative technology is so undesirable as to give consumers no real choice but to rent an Insight cable box. As a result, no rental or purchase markets have developed for cable boxes, and the plaintiffs allege that they are coerced to spend more money renting the necessary equipment from Insight than it would be worth if purchased outright.

Insight has no real competition among cable television providers in many of the areas in which it operates. Barriers to entry are high, as significant infrastructure is required for the delivery of cable television throughout a community. The main competitors are satellite television providers,

but their services are unavailable to many households, by dint of their location in areas without a clear view of the sky or in apartments where satellite dishes are specifically forbidden by the terms of the lease. Insight is also able to "bundle" its television services with broadband internet access and phone service, a tactic satellite providers cannot employ. Plaintiffs therefore maintain that satellite services do not serve as adequate substitutes for Insight's land-based cable television.

## II

A complaint "only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009) (*quoting Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)). This raises the bar from where *Conley v. Gibson*, 355 U.S. 41 (1957) had left it: Whereas under *Conley* a court was to dismiss a facially well-pleaded complaint only if its contents were so outlandish as to be utterly incapable of proof, *Iqbal* (along with its predecessor, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)) advises us to toss out a case unless the allegations meet some minimum standard of plausibility. *Courie*, 577 U.S. at 629-30. Specifically, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 556). While we must take the complaint's factual allegations as true in making this assessment, we need not accept the truth of legal conclusions or draw unwarranted factual inferences. *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000).

## III

Plaintiffs allege that Insight's policy of requiring premium cable subscribers to rent Insight cable boxes constitutes an illegal "tying" of one product (the cable box) to another (the cable service). To make out such a claim at this stage, the complaint must successfully allege five elements: (1) the existence of two separate products (i.e. a tying product and a tied product); (2) that the seller has appreciable economic power in the tying product market, such that it is able to coerce consumers into buying the tied product; (3) that the tying arrangement affects a substantial volume of commerce in the market for the tied product; (4) that the seller of the tying product has a direct economic interest in the sale of the tied product; and (5) that the plaintiff has suffered an antitrust injury as a result of the tying arrangement. *CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831, 834 (6th Cir. 2004) (unpublished) (citations omitted). *Cf.* ABA Section of Antitrust Law, 1 Antitrust Law Developments 177 (6th Ed. 2007) (hereinafter *Antitrust Law Developments*).

### A. Two Separate Products

According to the Supreme Court, "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). The question is whether the products in question are "distinguishable in the eyes of buyers." *Id.* In *Jefferson Parish*, the Court held that anesthesiological services were sufficiently distinct from the balance of the defendant hospital's package of offerings to give rise to a finding that two separate products existed. *Id.* at 23. The critical question was whether "there is a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product

market in which it is efficient to offer anesthesiological services separately from hospital services," and the court found that the answer was "[u]nquestionably" affirmative. *Id.* at 21-22. The Court reiterated this definition in *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992), holding that repair services and replacement parts were separate products subject to the prohibition on tying. This was the case even despite the defendant's claim that the two products were inextricably linked, in that either one was more or less useless without the other. *Id.* at 463 (*citing Jefferson Parish*, 466 U.S. at 19 n.30).

Plaintiffs here have adequately alleged the existence of two separate products. Absent Insight's allegedly illegal tying behavior, a market for cable boxes might well develop in the same way that there exist markets for modems and telephones, without which Internet and phone services are useless. Insight already offers multiple cable box products (such as, for instance, boxes offering Digital Video Recording capability (*see* Am. Compl. ¶ 22)), and bills its customers separately for the box rental and for the service itself (*id.* at ¶ 21). We reject the defense's suggestion that a finding of separate products requires "that an independent market *now* exists—from the comsumer's point of view—for the "tied" product." (Def.'s Br. 14 (emphasis added).) By that logic a firm could safely engage in anticompetitive activity provided he maintained such a complete monopoly as to prevent anyone else from selling the product in question—but that result is precisely the sort of thing that the antitrust laws are meant to avoid. The question is not whether a market exists in the sense of several firms already competing in the marketplace, but rather in the sense that there exists "sufficient demand" for the purchase of the tied product separately from the tying product "to identify a distinct product market" from the point of view of the consumer. *Jefferson Parish*, 466 U.S. at 21-22. Here the plaintiffs have alleged that such demand exists: they and others in the

putative class would like to buy cable boxes on the open market, but are foreclosed from doing so by the defendant's behavior and the consequent dearth of other options for obtaining the equipment. This claim is certainly "plausible" in this court's view, *Iqbal*, 129 S.Ct. at 1949, and there appears to be unanimous agreement on this point among the other courts who have addressed this question in recent months. *See In re Time Warner Inc. Set-Top Cable TV Box Antitrust Litig.*, 2010 U.S. Dist. LEXIS 22369 at *17-18, slip op. at 8 (S.D.N.Y. Mar. 5, 2010); *Parsons v. Bright House Networks, LLC*, No. 2:09-cv-0267-AKK, slip op. at 10-12 (N.D. Ala. Feb. 23, 2010); *In re Cox Enterprises, Inc. Cable Television Box Antitrust Litig.*, No. 09-ML-2048-C, slip op. at 4-5 (W.D. Okla. Jan. 19, 2010). We accordingly conclude that the plaintiffs have met the Rule 12(b)(6) standard with respect to their obligation to identify two separate products.

### B. Economic Power and Coercion

Although this element is listed singly in the relevant Sixth Circuit precedent, *see CTUnify*, 115 Fed. Appx. at 834, it apparently encompasses a number of prongs. The question is whether the defendant wields sufficient economic power in the market for the tying product such that it is able to force buyers to accept the tied product. *See id.* In order to show this to be the case, the plaintiffs must allege the existence of a relevant market in terms of both the tying product, *see Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009), and a geographic area, *see Mich. Div.—Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008). They then must allege that the defendant has the power to coerce customer to buy the tied product, *see Ill. Tool Works*, 547 U.S. at 46, and of course that the defendant actually exercised that power, *see Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461-62 (1992). We conclude that, as drafted, the Amended Complaint insufficiently alleges actual coercion, and that

it must therefore be dismissed. Because any newly filed complaint will have to change the allegations regarding the product market definition and Insight's power within that market, we will skip over those elements at present.

Without actual coercion, there is no restraint of trade and no Sherman Act claim. In a tying case the coercion takes the form of conditioning the availability of the tying product on the purchase of the tied product. *See id.* There is no dispute that the defendant's Premium Cable Services are available only with the aid of either a cable box or a television with CableCARD technology. Nor is there any allegation that Insight prevented its customers from using CableCARDs. The question is whether the existence of CableCARDs in the marketplace is sufficient to vitiate the plaintiffs' conditioning claim.

Plaintiffs allege that Insight has used its market power "to inhibit and thwart the effectiveness of CableCARD technology" (Am. Comp. ¶ 32), and that consumer electronics manufacturers have "repeatedly complained that Insight and other cable companies have engaged in practices to prevent the CableCARD from becoming an effective option for consumers who no longer wish to pay rental fees for cable boxes" (*id.* ¶ 33). Further, they allege that Insight has "limited the effectiveness of CableCARDs," such that consumers are unlikely to prefer that technology to Insight's cable boxes. (*Id.* at ¶ 35.) The main limit on CableCARDs' actual effectiveness appears to be that the device is (at present) not capable of two-way communication. (*See* Pl.'s Br. 10 (*citing Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Thirteenth Annual Report, MB Docket No. 06-189, FCC 07-207, at ¶ 263 (Rel. Jan. 16, 2009) (hereinafter "Thirteenth Annual Report")); Reply 9.) The definition of the tying product, Premium Cable Services, spec-ifically includes "pay per view" and "on demand"

video programming (Am. Compl. ¶ 18), at least some of which is not available without the two-way connection that CableCARDs do not offer (*see* Pl.'s Br. 10 (*citing* Thirteenth Annual Report ¶ 263)).

The Southern District of New York recently addressed precisely the same question, and concluded that dismissal was warranted. *In re Time Warner*, 2010 U.S. Dist. LEXIS 22369, at *26, slip op. at 14. The court ruled that because CableCARDs are a suitable replacement for those Premium Cable Services requiring only one-way communications, the plaintiffs' definition of the tying product (identical to the one now before this court) as including such services was fatal to its claim of coercion. *Id.* A customer desiring only one-way premium services (such as access to HBO and Showtime) had no need to rent a cable box. *Id.* This court finds itself in agreement with Judge Castel's analysis. The facts alleged might support a claim that those consumers wishing to buy two-way services are coerced into leasing a cable box, but the Amended Complaint does not so limit either the putative class or the product market. There is therefore in the court's view no plausible allegation of coercion as to the whole of the designated tying product; according to the amended complaint, only a part of that product is conditioned on rental of the tied product.[1]

While we will grant the motion to dismiss (via separate order), we are also in agreement with Judge Castel that a re-drafted complaint could make out a plausible claim for relief. *See id.* at *28,

---

[1] We note that what matters here is actual coercion in the form of conditioning. Insight's promotion of its own products, even if vigorous and at the expense of promotion of CableCARD technology, does not give rise to a finding of the sort of coercion alleged here. *See In re Time Warner*, 2010 U.S. Dist. LEXIS 22369, at *21-22, slip op. at 11 (*citing Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982)).

Plaintiffs also reprise an argument, based on *Eastman Kodak*, that Judge Castel rejected in *In re Time Warner*. Their assertion is that "[a] coercive scheme may be found even if the tying arrangement leaves the consumer with some choice, or even if the coercion is not 100% effective in meeting the defendants' anticompetitive goal." (Resp. 21.) We again join Judge Castel in finding this argument mistaken. In *Eastman Kodak*, the defendant required buyers of its replacement parts either to purchase repair services from Kodak or to promise to service their own machines; this prevented Kodak's clients from hiring third-party repairmen. 504 U.S. at 458. The result was to condition the availability of one product on an agreement not to buy a second product from a third-party. Actual coercion was therefore present. Here, however, there is no adequate allegation of conditioning, because CableCARDs provide an alternative to Insight customers who have no use for two-way communications. *See In re Time Warner*, 2010 U.S. Dist. LEXIS 22369, at *23-24, slip op. at 12-13.

slip op. at 15. The Federal Rules direct the court to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). Accordingly we will follow his lead, and (at plaintiffs' request) grant leave to file a second amended complaint to cure the defect. We admonish the plaintiffs to take care to ensure that any future pleading contains sufficient factual allegations to fulfill each of the elements of their claim, with specific reference to any newly asserted definition of the relevant tying product.