UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:09-CV-00093

MICHELLE DOWNS and  PLAINTIFFS
LAURIE JARRETT,

v.

INSIGHT COMMUNICATIONS  DEFENDANT
COMPANY, L.P., d/b/a INSIGHT.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendant Insight Communications Company ("Insight") to dismiss [DN 59] Plaintiff Michelle Downs's and Plaintiff Laurie Jarrett's Second Amended Complaint [DN 51] alleging a Sherman Antitrust Act claim. Fully briefed, the matter is ripe for decision. For the reasons that follow, the motion is denied.

### I. STANDARD OF REVIEW

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiff," League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true[,]" id., and determine whether the "complaint states a plausible claim for relief[,]" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. A complaint falls short if it pleads facts "merely consistent with

a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." Id. at 1949-50. Instead, the allegations must "'show[ ] that the pleader is entitled to relief.'" Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

## II. FACTUAL BACKGROUND

This case arises out of allegations that Insight engaged in an illegal restraint on trade, and accordingly violated the Sherman Antitrust Act, 15 U.S.C. § 1, by forcing customers to rent the set-top box necessary to receive Insight's Interactive Premium Cable ("IPC"). IPC is unique in that it is capable of two-way communication and includes such services as pay-per-view, an interactive programming guide, and on-demand options. Plaintiffs argue that consumers are unable to purchase the technology necessary to receive IPC from either Insight or on the open market. Therefore, Plaintiffs allege that Insight has impermissibly tied its IPC services to its own proprietary cable box. A complete recitation of the facts of the case can be found in Judge Simpson's Memorandum Opinion and Order [DN 40] entered June 6, 2010, and is incorporated herein by reference.

## III. DISCUSSION

Plaintiffs allege that Insight's policy requiring cable subscribers to rent the cable boxes from Insight in order to receive IPC constitutes an illegal "tying" scheme. "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" CTUnify, Inc. v. Nortel Networks, Inc., 115 F. App'x 831, 834 (6th Cir. 2004) (quoting Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 461 (1992) (citation omitted)). In order to make out a claim that Insight has tied one product (the set-top box) to another (IPC service), Plaintiffs must appropriately allege facts indicating: (1) the existence of two distinct

products, Eastman Kodak, 504 U.S. at 462; (2) "the seller has 'appreciable economic power' in the tying product market"; (3) "the arrangement affects a substantial volume of commerce in the tied market"; (4) "the seller of the tying product has a direct economic interest in the sale of the tied product"; and (5) "the plaintiff has suffered an antitrust injury as a result of the tying arrangement," CTUnify, 115 F. App'x at 834 (internal citation and quotations omitted).

Judge Simpson initially dismissed Plaintiffs' Sherman Act claim because Plaintiffs failed to show that Insight had actually coerced consumers into purchasing Premium Cable because some of the cable services within Plaintiffs' definition of Premium Cable could be accessed through a competing product - a CableCard.[1] However, Plaintiffs were given permission to amend their complaint in order to redefine the product market to include only those products which can not be accessed via a CableCard, namely, IPC. Defendant has now moved to dismiss Plaintiffs' Second Amended Complaint because Plaintiffs failed to sufficiently allege: (1) the existence of two distinct products; (2) that Insight has appreciable economic power in the tied market; or (3) the existence of an antitrust injury. Alternatively, Defendant alleges that the Supreme Court's recent holding in Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004), prevents the Court from addressing Plaintiffs' claims. The Court will discuss each of Defendant's arguments in turn.

**A. Two Distinct Products**

Plaintiffs allege that Defendant has inappropriately tied two distinct products, IPC and set-

---

[1] Plaintiffs allege that Judge Simpson errored in dismissing their First Amended Complaint based on the allegations that Insight had impermissibly tied its general Premium Cable services to the rental of set-top boxes. However, this Court agrees with Judge Simpson in that Premium Cable services can not be coerced because of the existence of CableCards, a reasonable substitute that allows for many of the same features offered by Premium Cable. Therefore, the Court will only address Interactive Premium Cable, cable services which are capable of two-way communication, as a basis for the tying scheme in this opinion.

top boxes, to one another. Defendant alleges that IPC is not distinct from set-top boxes because there is insufficient demand for the purchase of either products standing alone. The Court finds Defendant's argument unconvincing.

"[T]he answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the items." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 19 (1984), abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006). Thus, the issue is not whether the two products are inextricably linked or whether one is more or less useless without the other, but whether the products in question are "distinguishable in the eyes of buyers." Jefferson Parish, 466 U.S. at 19.

Judge Simpson already addressed this issue and found that premium cable services are distinct from set-top boxes because "absent Insight's allegedly tying behavior, a market for cable boxes might well develop in the same way that there exist markets for modems and telephones, without which Internet and phone services are useless." Downs v. Insight Commc'ns Co., 2010 WL 2228295, at *3 (W.D. Ky. June 3, 2010). The Court agrees. The mere fact that IPC services appear to "live on" the hard drive inside the television or set-top box is of no consequence. The Supreme Court "ha[s] often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." Eastman Kodak, 504 U.S. at 463 (internal quotation omitted). The Court finds that Plaintiffs have sufficiently alleged that consumers do distinguish between IPC and set-top boxes despite the fact that one is dependent on the other. See In Re Cox Enters., Inc., 2010 WL 5136047, at *2 (W.D. Okla. Jan. 19, 2010) (finding premium cable a distinct product from set-top boxes); Parsons v. Bright House Networks, 2010 WL 5094258, at *7 (N.D. Ala. Feb. 23, 2010) (same); In re Time Warner Inc. Set-Top Cable Television Box

4

Antitrust Litig., 2010 WL 882989, at *4 (S.D.N.Y. March 5, 2010) (same).

### B. Appreciable Economic Power

In order to prove this element it is necessary to show: (1) the existence of a relevant market which "consists of both a geographic component and a product component[,]" Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc., 588 F.3d 908, 916-17 (6th Cir. 2009); (2) that the "defendant has market power in the tying product" in order to coerce its purchase, Illinois Tool, 547 U.S. at 46; and (3) that the defendant actually exercised their coercive power, Eastman Kodak, 504 U.S. at 462.

#### 1. Product market

When analyzing this prong, the Sixth Circuit has found the "reasonable interchangeability" standard to be "[t]he essential test for ascertaining the relevant product market." White & White, Inc. v. Am. Hosp. Supply Corp., 723 F.2d 495, 500 (6th Cir. 1983). "Reasonable interchangeability" is assessed by considering: "(1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n., 388 F.3d 955, 961 (6th Cir. 2004) (internal quotations omitted).

Plaintiffs allege that the product market consists of IPC services such as on-demand programming, the interactive user guide, and pay-per-view. Plaintiffs claim that these features are not accessible via a CableCard or satellite and therefore no reasonable product is interchangeable with Insight's IPC. Plaintiffs further allege that another main source for interactive sources, internet vendors, do not offer reasonable substitutes because "websites have a much smaller library of

5

offerings" and because "[v]ideo over the internet [is] also frequently of poorer visual quality, [takes] longer to download, and [is] more prone to interruptions than cable MVPD." (Pls.' Second Am. Compl. 16-17.) Plaintiffs also allege a low cross elasticity of demand by claiming that "in the limited areas where more than one cable MVPD provider operate[s], the price of cable services has declined by as much as 20%, while in the areas where a single cable MVPD provider operates, the availability of satellite MVPD had not restrained cable MVPD providers from substantially increasing their prices. (Id. at 13.) Therefore, Plaintiffs have appropriately alleged that no reasonable substitute exists for IPC services, and that consumers do not respond to IPC price increases by purchasing substitute products. Bearing in mind that the "determination of the relevant product market is an issue for the jury to decide[,]" the Court finds this element met. Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917, 958 (6th Cir. 2005).

### 2. Geographic Market

Defendant next challenges whether Plaintiffs have properly defined the relevant geographic market. The geographic market consists of "the locale in which consumers of a product or service can turn for alternative sources of supply." Re/Max Intern., Inc. v. Realty One, Inc., 173 F.3d 995, 1016 (6th Cir. 1999). "The definition of a relevant geographic market varies from case to case depending on the type of product and the geographical characteristics of an area, but the relevant geographic market must identify the area of effective competition that the defendant encounters when it offers its product or service for sale." Scara v. Bradley Memorial Hosp., 1993 WL 404150, at *6 (E.D. Tenn. Feb. 4, 1993). Therefore, the selected geographic market must "both correspond to the commercial realities of the industry and be economically significant." Brown Shoe Co. v. United States, 370 U.S. 294, 336-37 (1962) (internal quotations and citation omitted). "What this

6

usually boils down to in practice is the area of actual or potential competition between the parties involved in the case." City of Cleveland v. Cleveland Elec. Illuminating Co., 734 F.2d 1157, 1167 (6th Cir. 1984).

Plaintiffs allege the potential areas of competition consists of specific communities in Kentucky, Indiana, and Ohio in which Insight provides IPC pursuant to franchise agreements. Plaintiffs allege that the IPC market within these areas are substantially similar and therefore Insight imposes a similar policy of requiring the rental of set-top boxes to access IPC. Although Plaintiffs have defined the geographic area rather broadly, the Court finds that, in light of the early stage of the proceedings, Plaintiffs have sufficiently alleged facts demonstrating a relevant geographic market.

### 3. Market Power

Plaintiffs must also demonstrate that Insight possessed sufficient market power in order to coerce the rental of the set-top box. "Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.'" Eastman Kodak, 504 U.S. at 464 (quoting Jefferson Parish, 466 U.S. at 14). More specifically, "[i]t has been defined as the ability of a single seller to raise price and restrict output. The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 817 (6th Cir. 1997) (internal quotations and citation omitted). However, market power also exists "when the seller offers a unique product that competitors are not able to offer." Jefferson Parish, 466 U.S. at 17. "Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." Fortner Enters., Inc. v. United

States Steel Corp., 394 U.S. 495, 504 (1969). Requiring proof of market power "is important because, without market power, a seller cannot engage in the forcing necessary to establish a § 1 violation." PSI Repair, 104 F.3d at 818.

Plaintiffs claim that Insight is able to raise its prices above competitive levels and is one of the ten largest cable MVPD providers in the country. Plaintiffs further allege that Insight has raised its pricing for IPC at a rate three times that of inflation. Lastly, Plaintiffs allege that IPC is a unique product which neither the internet, satellite service, or a CableCard are able to offer. These facts, if true, indicate that Insight controls a large portion of the IPC market, and can therefore manipulate pricing without regard to competition in the area. Accordingly, the Court concludes that Plaintiffs have properly pled that Insight possesses the requisite market power to make out a tying claim.

### 4. Actual Coercion

In order to establish a tying arrangement, the plaintiff must also allege "coercion by the seller, i.e., the seller must condition the sale of the tying product on the buyer's purchase of the tied product." Compuware Corp. v. Int'l Bus. Machs., 259 F. Supp. 2d 597, 601 (E.D. Mich. 2002). Plaintiffs allege that Insight conditions receipt of IPC services on the rental of the set-top box. In other words, because Insight's IPC services are allegedly not accessible through other means, consumers are forced to rent the set-top box if they wish to access IPC. These facts, if true, may entitle Plaintiffs to relief and are sufficient for pleading purposes to establish actual coercion.

### C. Anticompetitive Effects

The final element of a Sherman Act claim requires that Plaintiffs allege "a link, [or tie], between defendant's market power and harm to competition in that market[,] Parsons, 2010 WL 5094258 at *7, and that the tie "affects a substantial volume of commerce in the tied market[,]"

Eastman Kodak, 504 US at 462. "[T]he controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie, for . . . it is unreasonable, per se, to foreclose competitors from any substantial market by a tying arrangement." Fortner Enters., 394 U.S. at 501 (internal quotations omitted).

Plaintiffs claim that Insights' alleged tying arrangement has inhibited electronics manufacturers from competing in the set-top box market which has allowed Insight to successfully charge supra competitive rates for its IPC services. Allegedly, Insight has prevented competition from entering the set-top box market capable of two way communication because third party set-top boxes and CableCards are unable to access Insight's IPC services. As a result, Plaintiffs allege that Insight's policies have stifled competition and left little incentive for a competitor who wishes to enter the interactive set-top box market. Plaintiffs' complaint appropriately indicates that Insight's market power and policies have foreclosed a substantial volume of commerce. Therefore, the anticompetitive effects element is met.

### D. FCC Regulation

Defendant alleges that Plaintiffs' complaint must be dismissed because the FCC is currently addressing the concerns at issue here under the 1996 Telecommunications Act. Defendant relies on Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004), where the Supreme Court dismissed a Sherman Act class action claim because the FCC had taken the burden upon themselves to address the complained of harms and warned courts to avoid hearing conflicts where the resolution might conflict with the FCC agenda. The Supreme Court found that the savings clause of the Act was inapplicable because it preserved only those "claims that satisfy established

antitrust standards." Id. at 406. Here, however, Plaintiffs' claims are grounded in established antitrust standards and would exist regardless of the regulations the FCC may choose to implement. Accordingly Trinko is inapplicable to this case because Plaintiffs' antitrust claim falls squarely within the savings clause. See Cox Enters., 2010 WL 5136047, at *4-5 (finding Trinko inapplicable to plaintiff's Sherman Act claim); Parsons, 2010 WL 5094258, at *8 (same).

Plaintiffs have appropriately alleged all elements necessary to a Sherman Act claim and Defendant's Motion to Dismiss is denied.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's motion to dismiss [DN 59] is **DENIED**.

cc. Counsel of Record