# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

CIVIL ACTION NO. 3:09-CV-00093-JHM

LAURIE JARRETT, THOMAS J. GRACE
ELIZABETH "LIBBY" EILERS                                                        PLAINTIFFS

v.

INSIGHT COMMUNICATIONS
COMPANY, L.P., d/b/a INSIGHT                                                    DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendant Insight Communications Company, L.P. ("Insight") for summary judgment [DN 146] on the Third Amended Complaint filed by Plaintiffs, Laurie Jarrett, Thomas J. Grace, and Elizabeth "Libby" Eilers. Oral arguments were held May 7, 2014. Richard P. Rouco and Mark K. Gray appeared on behalf of the Plaintiffs, and Margaret Zwisler, Jennifer L. Giordano, and Janice M. Theriot appeared on behalf of Defendant. Fully briefed and argued, this matter is ripe for decision.

## I. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard the Court reviews the following facts.

## II. BACKGROUND

Plaintiffs allege that Insight's policy or practice requiring cable subscribers to rent the cable boxes from Insight in order to receive Insight's Interactive Premium Cable ("IPC") services constitutes an illegal tying scheme that unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. IPC is unique in that it is capable of two-way communication between the subscriber and Insight and includes such services as pay-per-view, an interactive programming guide, and on-demand options. Plaintiffs argue that consumers are unable to purchase the technology necessary to receive IPC from either Insight or on the open market. Therefore, Plaintiffs allege that Insight has impermissibly tied its IPC services to its own proprietary cable box. A complete recitation of the facts of the case can be found in Judge Simpson's Memorandum Opinion and Order [DN 40] entered June 3, 2010, and is incorporated herein by reference. Defendant now moves for summary judgment on the Third Amended

Complaint arguing that Plaintiffs failed to come forward with sufficient evidence to create a genuine dispute about whether Insight violated antitrust law by forcing Plaintiffs to lease a set-top box from Insight in order to obtain two-way interactive premium cable services.

## III. DISCUSSION

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" CTUnify, Inc. v. Nortel Networks, Inc., 115 Fed. Appx. 831, 834 (6th Cir. 2004) (quoting Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 461 (1992) (citation omitted)). "Tying arrangements are unlawful because they 'harm existing competitors or create barriers to entry of new competitors in the market for the tied product,' Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 14 (1984), abrogated in part on other grounds by Illinois Tool Works Inc. v. Independent Ink, Inc., 547 U.S. 28 (2006); . . . or will 'force buyers into giving up the purchase of substitutes for the tied product,'" United States v. Loew's, 371 U.S. 38, 45 (1962), abrogated in part on other grounds by Illinois Tool Works, 547 U.S. 28." Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1199 (9th Cir. 2012) (citations omitted).

"[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." Jefferson Parish, 466 U.S. at 12. "[I]n some situations a tying arrangement can be created without a direct requirement that the plaintiff

3

purchase the tied product in order to purchase the tying product." Valassis Communications, Inc. v. News America, Inc., 2011 WL 2420048, *6 (E.D. Mich. Jan. 24, 2011). "Courts have found tying arrangements where the buyer's only economically viable option is to purchase both the tying and the tied product." Shamrock Marketing, Inc. v. Bridgestone Bandag, Inc., 775 F. Supp. 2d 972, 981 (W.D. Ky. 2011). See also Marts v. Xerox, Inc., 77 F.3d 1109, 1113 (8th Cir. 1996) (stating that products were not tied unless the package was the "only viable economic option" and separate purchases were "prohibitively expensive"). The Sixth Circuit also recognizes a tying arrangement when a deal "induces all rational buyers" of the tying product to accept the tied product. Shamrock Marketing, 775 F. Supp.2d at 981 n. 7 ("Courts have also inferred the existence of a tying arrangement where the circumstances surrounding a transaction, for all practical purposes, force a buyer into purchasing the tied product."). "[W]here the buyer is free to take either product by itself there is no tying problem. . . ." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 6 n. 4 (1968).

### A. Contracts, Policies, and Practices

There is no contractual provision requiring that Insight customers rent an Insight set-top box in order to participate in the full panoply of digital services. Likewise, the policies and practices of Insight reflect that Insight did not condition the rental of an Insight cable set-top box to access IPC services. See, e.g., Valassis Communications, 2011 WL 2420048, *6. Insight's written policy permitted its subscribers to use their own lawfully acquired set-top boxes that were compatible with Insight's systems. Insight provided this information to subscribers and potential subscribers on its public website. Specifically, the website provided in part that: "It is our policy to support those digital receivers which may be provided directly by our customers. We comply

4

fully with all federal regulations governing the customer's right to facilitate their authorized receipt of our cable services through lawful customer-owned equipment by offering a 'CableCARD' for lease that will provide access to certain Insight services that require descrambling." (SOF ¶¶ 36-37.) Additionally, the annual rate cards distributed to providers had a bundled price for digital subscribers who leased from Insight and a separate unbundled price for subscribers who "provide their own digital receiver (subject to certain specifications) from a recognized retailer." (Id. at ¶ 39.) The rate card further provided that subscribers had "the option to purchase [their] own compatible cable receiver from a variety of recognized area retail and electronics stores." (Id. at ¶ 41.) Thus, the customer information on Insight's website and rate cards indicates that customers were free to obtain an approved non-Insight set-top box.

The Court is aware that under Frequently Asked Questions on Insight's website, in response to the question "[d]o I need a cable box if my television is 'cable-ready'?," Insight states: "Yes, with digital cable an Insight digital set-top box is required to receive all the programming and convenient features, like the interactive guide and On Demand TV. Insight will bring the box to your home and set it up for you." (Rouco Decl., Exhibit 6, FAQ-Digital Cable.) However, this statement alone does not reflect a policy or practice on the part of Insight of requiring an Insight cable set-top box to access IPC services. In fact, this statement is completely contrary to the other statements contained on the website and Insight's practice of permitting customers to use their own set-top boxes. Further, Insight's website contained a specific question about whether a subscriber could "provide [his] own set-top box" and the answer was clearly "yes." (SOF ¶¶ 36-37; Brecher Decl. ¶ 4.) Accordingly, given the bulk of the policy information on Insight's website, the Court finds that no genuine dispute exists regarding whether Insight's policies or practices

required customers to lease an Insight set-top box to subscribe to interactive digital cable television.[1]

### B. Economically Viable Option

Plaintiffs also failed to present any evidence demonstrating that Insight made leasing a set-top box from it the only economically viable option for its subscribers to obtain two-way services. As discussed above, "[c]ourts have found tying arrangements where the buyer's only economically viable option is to purchase both the tying and the tied product." Shamrock Marketing, 775 F. Supp.2d at 98. See also Marts, 77 F.3d at 1113 (stating that products were not tied unless the package was the "only viable economic option" and separate purchases were "prohibitively expensive"); Virtual Maintenance, Inc. v. Prime Computer, Inc., 957 F.2d 1318, 1322-1324 (6th Cir. 1992)(the cost of the bundle was $16,000, but the cost of the tying product purchased alone was $80,000 to $160,000; court stated that "[a] tying arrangement clearly exists here because the large price differential between software support alone and the software support/hardware maintenance package induces all rational buyers of Prime's software support to accept its hardware maintenance." ); Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1489, 1500-01 (8th Cir. 1992)(the Eighth Circuit granted summary judgment in favor of the defendant, even though the tying product was more expensive by itself, because it was not prohibitively more expensive than the bundle).

In the present case, the record reflects that Insight charged less for the tying product alone

---

[1] On July 3, 2014, the district court in In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litigation, 2014 WL 2993788 (W.D. Okla. July 3, 2014), issued an opinion denying summary judgment on the claim that Cox Enterprises illegally forced customers to rent a set-top box in order to gain full access to its premium cable services in violation of the Sherman Act, 15 U.S.C. § 1. In re Cox Enterprises is distinguishable from the present case. Unlike the defendant in In re Cox Enterprises, Insight did not expressly condition the rental of a set-top box from it as a required step in obtaining IPC services. Id. at *2.

than as part of the bundle during the relevant time period. In fact, while the parties disagree on the amount of the savings, Plaintiffs' expert testified that subscribers paid at least $1.00 less to Insight if they used their own set-top box, than if they leased a box from Insight. (Singer Decl. ¶ 11.) Additionally, Insight's 2010 rate card lists the rate for the bundled package of Insight Digital 6.0 plus the lease of set-top box (and remote control) at $7.95. The rate card price for just Insight Digital 6.0 "compatible features only" (i.e. without the lease of a set-top box and remote control) was $4.95. The rate card noted that the $4.95 price was '[a]vailable only to customers who provide their own digital receiver (subject to certain specifications) from a recognized retailer." (DN 146, Ex. 2-B, Rate Card.)

The Plaintiffs have not identified any authority to support a finding of coercion based on lack of economic viability when a defendant charges the same price or less for the tying product standing alone. Coercion is not present in such a situation because a defendant's pricing of the tying product did not "force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Jefferson Parish, 466 U.S. at 12. Thus, under the facts of this case, Insight did not use any alleged power over the price of the tying product to compel the Plaintiffs to lease a box.

### C. Percentage of Subscribers that Lease Set-top Box

Furthermore, contrary to Plaintiffs' argument, the fact that 99 percent of subscribers chose to lease a set-top box is not sufficient to create a material dispute of fact on the issue of coercion under the facts of the case. Plaintiffs argue that the Court should infer coercion from that fact that in mid-2012 over 99 percent of all Insight digital cable TV subscribers leased an Insight digital set-top box. During this time, Insight had 595,973 customers. Of those customers, 5,784

customers had cableCARDS used in cable ready devices and 12 customers used their own non-Insight set-top boxes. However, it is well-established that "even 100 percent[] of bundled sales does not itself indicate that two products have been tied together." Areeda & Hovenkamp, Antitrust Law ¶ 1756b2, at 327 (3d ed. 2008). See,e.g., Freeland v. AT&T Corp.,238 F.R.D. 130, 155 (S.D.N.Y. 2006)(rejecting the argument that because 100 percent of subscribers who purchased wireless services from carriers also purchased handsets from the same carriers demonstrated coercion.)

Here, it is undisputed that commercial realities have limited the number of Insight-compatible two-way devices available to consumers for purchase at retail. Set-top manufacturers exercised their own independent business decision in deciding not to sell two-way devices directly to consumers at retail. Representatives of Motorola and Pace averred that Insight never sought to preclude or discourage them from offering set-top boxes at retail or to dictate the prices at which they might have done so. (SOF ¶¶ 49-54.) In fact, at the oral argument, Plaintiffs even recognized that they "understand that that's Motorola and Pace's decision not to sell a retail box. They didn't want to go to retail. They have their own reasons for that." (May 7, 2014, Oral Argument at 34.) Where decisions of third parties "produce[] the practical effect" of limited consumer choices, that is "legally insufficient" to establish coercion for a tying claim. Konik v. Champion Valley Physicians Hosp. Medical Center, 733 F.2d 1007, 1018 (2d Cir. 1984). Thus, the fact that a high percentage of subscribers leased boxes from Insight to obtain two-way services does not demonstrate that Insight unlawfully forced them to do so.

Furthermore, the record reflects that during the time period in question, Insight permitted its subscribers to use set-top boxes that were available to them from other approved sources. For

example, one customer purchased the Motorola's DCP501 devices which allowed subscribers to participate in the cable company's two way services, and Insight permitted him to use it to access all of its services, including its two-way services. (SOF ¶¶ 45, 47.)

### D. Insight's Promotion and Control of Set Top Boxes

As discussed above, in the absence of an explicit tying agreement, "[c]ourts have also inferred the existence of a tying arrangement where the circumstances surrounding a transaction, for all practical purposes, force a buyer into purchasing the tied product." Shamrock Marketing, 775 F. Supp. 2d 972, 981 n. 7 (W.D. Ky. 2011). See Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia, 815 F.2d 1407, 1418 (11th Cir. 1987). The facts and circumstances related to Insight's promotion and control of its set-top boxes do not independently support the inference of a tying arrangement.

**1. Dissemination of Set-Top Box Policy**

Plaintiffs' claim that a reasonable juror could infer that leasing an Insight set-top box was required to subscribe to IPC services because Insight did not clearly disseminate its set-top box policy to subscribers. Plaintiffs state that they were not aware of the option to use a non-Insight set-top box and receive all the same features and services available with Insight digital cable. (Jarrett Dep. 86-87; Eilers Dep. 68-69, 80; Grace Dep. *95-97*.) Contrary to Plaintiffs' argument, Insight is not obligated to publish a written policy at all, much less to ensure that it was "clearly disseminated" to Plaintiffs. Areeda ¶ 1756a ("[D]efendant has no obligation to offer or remind the buyer of an option to buy product A alone."); Unijax, Inc. v. Champion Intern., Inc., 683 F.2d 678, 685-687 (2d Cir. 1982)("A manufacturer's use of 'strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce (its) retailer to buy its full line of products' does not,

9

however, amount to actual coercion." Id. at 685.).

### 2. Obligation to Create a Secondary Market

Plaintiffs argue that Insight controls the set-top box market through a lease-only option and precludes development of a secondary market where subscribers could sell their used boxes. Plaintiffs contend that because Insight does not offer a purchase option, it owns the vast majority of all cable set-top boxes currently in use and is essentially the only purchaser of set-top boxes programmed to work on Insight's system. It is undisputed that Insight does not manufacture set-top boxes, nor does it control the market decision of the companies that do. Furthermore, section 1 "of the Sherman Act [does not give] a purchaser the right to buy a product that the seller does not wish to offer for sale." Jefferson Parish, 466 U.S. at 24 n. 40. Thus, contrary to Plaintiffs' argument, Insight is not obligated to create a secondary market for set-top boxes.

### 3. Insight's Requirements on Use of Third-Party Set-top Box

Plaintiffs argue that Insight's imposition of requirements on the use of third party set-top boxes forces subscribers to lease set-top boxes from Insight. "Where a contract or franchising agreement provides that buyers shall use only the seller or a source 'approved' by the seller to purchase the tied product, the courts have looked to see if the approval clause was reasonable and permitted the buyer meaningful freedom of choice, or whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller." Tic-X-Press, Inc., 815 F.2d at 1416. Insight's website provided that

> [i]n order for us to authorize receipt of scrambled Insight cable services through a set-top receiver or digital cable-ready set that a customer provides, the customer must establish to Insight's reasonable satisfaction that such device is unaltered from its original condition, produced by a recognized and legitimate manufacturer of such devices, and the device must be compatible with Insight's

10

> technical specifications to prevent physical or electronic harm to Insight's system.

(Rouco Decl. Ex. 12, FAQ-Digital Cable.) Plaintiffs maintain that because Insight did not publish specific technological criteria for customer provided set-top boxes, Tic-X-Press supports the conclusion that the "approval" clause forced subscribers to lease the set boxes from Insight.

The decision in Tic-X-Press is distinguishable from the facts of the present case. In Tic-X-Press, the Plaintiff complained that the defendant Omni Promotions (the exclusive Omni arena promoter) required outside concert promoters to use a specific ticketing service (TOPCOL) as a condition of leasing the Omni arena. The defendant, however, pointed to language in its contract with outside concert promoters that allowed the concert promoters to select their own ticketing agency for the event, subject to defendant's approval. Id. at 1412. In denying summary judgment, the court found there was no written information provided in advance that spelled out the specifications or procedures for seeking approval. Id. Another factor significant to the denial of summary judgment in Tic-X-Press was that no promoter had ever requested permission to use another ticket agency, notwithstanding the approval clause, because they understood through years of dealing with the defendant that they were required to use defendant's selected ticketing agent. Id. at 1417. Additionally, the defendant had never approved another ticket agency. Id. In contrast to Tic-X-Press, the record here reflects that other Insight customers requested to use their own two-way communication set-top box and Insight had approved the request. Also, the customers who requested to use their own two-way communication set-top boxes called Insight to confirm that the device was compatible and to provide the serial number of the box so Insight could confirm the device had not been stolen. (Wright Supp. Decl. ¶¶ 4-6.) As a result, unlike the facts present in Tic-X-Press, the record does not support a finding that Insight cable subscribers

11

were forced for all practical purposes to use the Insight's set-top boxes. Id. at 1418.

### E. Dr. Hal Singer's Opinions

The opinions of Plaintiff's liability expert Dr. Hal Singer are not sufficient to create a genuine dispute about whether Insight forced subscribers to lease a set-top box from Insight to obtain two-way services. First, Dr. Singer's opinions are based on premium cable service as the tying product. This Court has specifically held that premium cable could not be the tying product. Instead, the tying product is interactive premium cable services. Second, Dr. Singer's opinion that Insight digital cable TV subscribers who provide their own set-top box suffer quality degradation is not supported by the record. Instead, the record reflects that Insight's interactive premium cable service was available to any customer who leased a CableCARD and inserted it into their own compatible two-way device. No evidence exists regarding the quality of Insight's IPC services provided to those customers. Finally, much of Dr. Singer's opinions rely on general information of cable companies in FCC reports. Dr. Singer does not utilize evidence related to actual Insight equipment or practices during this period of time.

In considering the facts in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs have failed to produce sufficient evidence to create a genuine dispute about whether Insight violated § 1 of the Sherman Act by forcing Plaintiffs to lease an Insight set-top box in order to receive the full benefit of Insight's interactive premium cable services.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Defendant Insight Communications Company, L.P. for summary judgment [DN 146] is **GRANTED**. The Court will enter a judgment consistent with this Opinion.

Joseph H. McKinley, Jr., Chief Judge
United States District Court

July 29, 2014

cc: counsel of record